# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 28, 2011

No. 09-30794

Lyle W. Cayce
Clerk

ANGELA KING, M.D.,

Plaintiff-Appellee Cross-Appellant

v.

UNIVERSITY HEALTHCARE SYSTEM LC,

Defendant-Appellant Cross-Appellee

Appeals from the United States District Court
for the Eastern District of Louisiana

Before JONES, Chief Judge, JOLLY, and GARZA, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Dr. Angela King sued her former employer, University Healthcare System, L.C. ("UHS"), for sex discrimination, retaliation, breach of oral contract, violation of the Equal Pay Act ("EPA"), and violation of the Louisiana Wage Payment Statute ("LWPS").  A jury found that UHS did not discriminate against Dr. King because of her sex, illegally retaliate against her, or breach an oral contract between UHS and Dr. King.  The jury did find, however, that UHS violated the EPA and LWPS.  The jury awarded Dr. King $32,700 in compensatory damages under the EPA, and the court awarded her an additional $32,700 in liquidated damages under the EPA and $75,000 in penalties under the LWPS.  The court awarded $76,370.54 in attorney's fees to UHS and

No. 09-30794

$72,613.80 in attorney's fees to Dr. King.  Both Dr. King and UHS have appealed aspects of the court's ruling.

I

Beginning in 2005, UHS employed Dr. King as an anesthesiologist at Tulane University Hospital ("Tulane").[1]  Dr. King worked pursuant to a written employment agreement with an expiration date of March 14, 2007.  Under the agreement, Dr. King was paid a base salary, plus an additional capped sum based on the amount of time she spent on specialty calls.  The contract specified that Dr. King was to work a minimum of forty-six weeks per year and forty hours per week.  The contract also contained an integration clause:

> Entire Agreement. This Agreement shall constitute the entire agreement of the parties hereto and may not be amended except in writing signed by all of the parties hereto. No oral statements or prior written materials not specifically incorporated herein shall be of any force or effect.

During Dr. King's tenure with UHS, Hurricane Katrina struck New Orleans, displacing many of the city's medical professionals.  UHS was unable to keep Tulane open, and instead Dr. King and others temporarily operated out of Lakeside Hospital ("Lakeside"), a facility that UHS had recently acquired.  The number of anesthesiologists working for UHS fell from twelve before the hurricane to only eight after.  The remaining doctors, including Dr. King, worked long hours to meet the needs of their patients.  Eventually Tulane reopened and UHS hired additional anesthesiologists, but Dr. King continued to bear a heavy workload.

During this time, Dr. Charles Fox was the clinical director of the anesthesiology department at Tulane.  Dr. King testified at trial that, amidst the strain of the post-Katrina period, she and Dr. Fox discussed the possibility of

---

[1] Prior to 2005, the Hospital's anesthesiologists were employees of Tulane Medical School.

additional payments being made to the anesthesiologists, including Dr. King, based on their increased hours. According to Dr. King, they agreed that UHS would pay $150 per hour for each "extra" hour she worked. Dr. Fox testified by video deposition that the UHS physicians who remained in New Orleans after Katrina had numerous discussions about the possibility of additional compensation based on their heavy workload, but that he did not recall promising Dr. King—and would not have had the authority to promise Dr. King—that she would be paid $150 per hour for extra hours of work. Dr. King, however, introduced evidence showing that she and other doctors began logging their hours at about the same time the extra payment discussions took place. Both Dr. King's logs and other physicians' reflected the $150 rate. Dr. King was even paid $300, apparently pursuant to one such time log. Dr. Michael Mascia, another UHS anesthesiologist, was similarly paid $3,000 for time logged on the time sheets. Kim Ryan, the chief operating officer and interim CEO of UHS, testified that the payments to both doctors were made in error.

Soon, the time approached for physicians' contracts, including Dr. King's, to be renewed. UHS began preparing and circulating proposed contract addenda that included a $33,000 payment in addition to a physicians' ordinary pay. Ryan testified that the $33,000 bonus was offered to the anesthesiologists across the board. Dr. King first received an "Employment Agreement Addendum" with the subhead "Extension Bonus." The addendum offered $33,000, which was characterized in the body of the addendum as an "Extension Bonus." The addendum provided that the bonus was payable upon the receipt of a fully executed second employment agreement. Sometime thereafter, however, UHS presented Dr. King with a second draft of the addendum. The "Extension Bonus" subhead had been replaced with "Extra Hours Bonus." The body of the addendum similarly characterized the payment as an "Extra Hours Bonus," rather than an "Extension Bonus." Unlike the first addendum, this addendum

No. 09-30794

subtracted Dr. King's earlier $300 payment, leaving a total bonus of $32,700. Dr. King signed this addendum, but the record does not suggest that she ever returned the signed copy, and it was never signed by a representative of UHS. Finally, UHS provided Dr. King with a third draft of the addendum. The third draft continued to refer to the payment as an "Excess Hours Bonus" and deduct the $300. It also included a new clause: "This Excess Hours Bonus will compensate for excess hours worked from the time period beginning 8/29/05 through 7/31/06." Dr. King testified at trial that she considered this term unfair and the $33,000 inadequate payment for the full extra work she did following the hurricane.

At the same time, UHS was offering the anesthesiologists contract renewals. UHS took the position that it would not pay the $33,000 bonus to an anesthesiologist unless the anesthesiologist signed both the addendum and the extension. Dr. King did not sign either a contract extension or the final draft of the addendum, and she did not receive a bonus. Ryan testified that every anesthesiologist except Dr. King signed the addendum, including Dr. Mascia. Dr. Mascia, however, allowed his contract with UHS to expire without signing an extension. Nevertheless, he was paid a bonus of $30,000—$33,000 minus the $3,000 that UHS had already paid him based on his time sheets. Ryan testified that Dr. Mascia was paid the bonus only because, at the time, contract negotiations between Dr. Mascia and UHS were ongoing and UHS believed that Dr. Mascia would re-sign.

Although Dr. King believed that her conflict with UHS could still be resolved, UHS informed her that her contract would not be renewed. Her tenure with the organization, therefore, ended with the expiration of the original written contract. Dr. King brought this suit. In the wake of the jury's verdict and the district court's final judgment, the parties filed cross-appeals.

No. 09-30794

II

Both parties have raised challenges relating to either the admission or discoverability of evidence. UHS challenges the admission of testimonial evidence relating to the formation of an oral contract between it and Dr. King. Dr. King challenges the exclusion of portions of two exhibits, as well as the district court's conclusion that certain e-mails that Dr. King sought to discover were privileged. For the reasons below, we find no error in the district court's rulings.

A

UHS argues that the district court erred by admitting evidence in support of an oral contract to pay Dr. King $150 per hour for the extra hours that she worked. It suggests that the district court disregarded our precedents establishing that, under Louisiana law, extraneous evidence of oral agreements may not be admitted to vary the terms of a written contract containing an integration clause. Dr. King responds that the evidence of an oral agreement with UHS was offered to establish the existence of a separate oral contract, as permitted by Louisiana law and our precedents.

The general rule in Louisiana is that a court may not consider parol evidence to alter the terms of a written agreement when that agreement "is a complete and accurate statement of all the terms agreed upon by the parties." *Stokes v. Georgia-Pacific Corp.*, 894 F.2d 764, 768 (5th Cir. 1990); *see also* LA. CIV. CODE ANN. art. 2046. Louisiana law provides that a court may, "in the interest of justice," consider testimonial evidence "to prove that the written act was modified by a subsequent and valid oral agreement." LA CIV. CODE ANN. art. 1848. Even a written merger or integration clause is not a *per se* bar on consideration of parol evidence. *Omnitech Int'l, Inc. v. Clorox Co.*, 11 F.3d 1316, 1328 (5th Cir. 1994). If, however, the facts of a particular case show "that the merger clause correctly reflected the parties' intentions," then the clause "should

No. 09-30794

thus be enforced as written." *Id.*; *see also Condrey v. SunTrust Bank of Ga.*, 429 F.3d 556, 564 (5th Cir. 2005).

Insofar as the district court's ruling was purely evidentiary, we review it for abuse of discretion only. *Compaq Computer Corp. v. Ergonome, Inc.*, 387 F.3d 403, 408 (5th Cir. 2004). We conclude that, under the circumstances, the district court acted within its discretion in granting Dr. King latitude to attempt to establish that the integration clause did not fully reflect the parties' intentions and that her employment contract was modified by a subsequent and valid oral agreement. We note, however, that under Louisiana law, "[t]he mere admissibility of oral statements does not require an automatic finding that the statements have the substantive effect of either varying or nullifying a contract . . . ." *Bass v. Coupel*, 671 So. 2d 344, 353 (La. Ct. App. 1995). To the contrary, a court's admission of parol evidence is "only the first step in the process for determining its functional efficacy under the parol evidence rule." *Id.* The question of whether a subsequent agreement was actually formed, despite the terms of the integration clause, goes to whether the verdict was plainly erroneous, which we consider below.

B

Dr. King argues that the district court erred in refusing to allow the jury to see portions of e-mails between Dr. King's attorney and a UHS attorney. Again, our review is for abuse of discretion. UHS filed a Motion in Limine to exclude portions of the exhibits on the basis that they were settlement communications under Rule 408(a) of the Federal Rules of Evidence. The district court granted the motion in part, excluding portions of the e-mails that it found reflected Dr. King's or UHS's willingness to settle. The district court, however, denied UHS's motion insofar as it sought to exclude the e-mails completely. Rather, the district court held that they were inadmissible only insofar as they were offered to prove UHS's liability or the amount of Dr. King's

claims. The district court concluded that portions of the e-mails were admissible for permitted purposes, such as showing that Dr. King advised UHS that she had a claim for employment discrimination.

Rule 408(a) of the Federal Rules of Evidence provides that "conduct or statements made in compromise negotiations regarding [a] claim" are "not admissible on behalf of any party, when offered to prove liability for, invalidity of, or amount of [the] claim . . . or to impeach through a prior inconsistent statement or contradiction." *See also Ikossi-Anastasiou v. Bd. of Supervisors of La. State Univ.*, 579 F.3d 546, 551 (5th Cir. 2009). Dr. King argues in a conclusory fashion that she offered the e-mails for a permissible alternative purpose. She is unable, however, to explain what permissible purpose she was unable to pursue. Instead, Dr. King argues merely that if the jury had seen the redacted information, it might have ruled differently on her contract claim. Insofar as that is true, Dr. King's reliance on settlement negotiations to prove liability would be a paradigmatic Rule 408(a) violation. Dr. King's argument on this issue has no merit.

C

Dr. King next argues that the district court erroneously denied discovery of e-mails that would have provided further support for her EPA and Title VII claims. Dr. King asked the district court to engage in an *in camera* review of several e-mails that UHS had asserted were covered by attorney-client privilege. Dr. King argues that those e-mails may have revealed details about the reasons for the non-renewal of her contract—which would, she posits, have supported her EPA and Title VII claims. The district court refused to engage in an *in camera* review of the e-mails, concluding, based on UHS's privilege log, that the e-mails were "privileged on their face and protected from discovery."

"[T]he attorney-client privilege protects communications made in confidence by a client to his lawyer for the purpose of obtaining legal advice."

7

No. 09-30794

*Hodges, Grant & Kaufmann v. United States*, 768 F.2d 719, 720 (5th Cir. 1985) (citation omitted). The party invoking attorney-client privilege has "[t]he burden of demonstrating [its] applicability." *Id.* at 721. "The application of the attorney-client privilege is a question of fact, to be determined in the light of the purpose of the privilege and guided by judicial precedents." *United States v. Neal*, 27 F.3d 1035, 1048 (5th Cir.1994) (internal quotation marks and citation omitted), *cert. denied*, 513 U.S. 1179 (1995). "The clearly erroneous standard of review applies to the district court's factual findings. We review the application of the controlling law *de novo*." *Id.* (internal quotation marks and citation omitted).

The district court based its decision not to review the individual e-mails for privilege on UHS's FED. R. CIV. P. 26(b)(5) privilege log. The privilege log lists the authors and recipients of the e-mails, a brief description of each withheld communication, the amount of each document withheld, and the type of privilege asserted. A review of the privilege log entries confirms the district court's conclusion that it describes communications between client and attorney for the purpose of obtaining legal advice. The district court did not clearly err by deciding to credit these descriptions as accurate and concluding that UHS met its initial burden to show that it was entitled to protection by the privilege. In rebuttal, King has offered only speculation that the e-mails are not covered by privilege because they were made for a purpose other than obtaining legal advice. In such a situation, the district court did not err in declining to engage in a full *in camera* review of the challenged e-mails.[2]

---

[2] Dr. King also argues, in a conclusory fashion and without citation to additional authority, that (1) discovery sanctions imposed against her were in error and (2) the district court erred in preventing her from introducing the privilege log itself into evidence. The sanctions argument seems, at best, to be an extension of her argument that she should have been allowed to discover the e-mails. Because we find no error with regard to the district court's discovery decision, we find none with regard to the sanctions. To the extent that Dr. King has adequately raised the admissibility of the discovery log, we find no abuse of

No. 09-30794

### III

Dr. King argues that the evidence was insufficient to support the jury's finding that UHS did not breach an oral contract to pay Dr. King $150 per hour for the extra hours that she worked.   Dr. King concedes that, because she did not file a Rule 50(b) motion for judgment as a matter of law, we review the jury's verdict for plain error and may reverse "only if the judgment complained of results in 'manifest miscarriage of justice.'" *Stover v. Hattiesburg Pub. Sch. Dist.*, 549 F.3d 985, 995 (5th Cir. 2008) (internal quotation marks and citation omitted).   Nevertheless, she argues that she has proven her case so thoroughly that a manifest miscarriage of justice will result if the jury is not reversed. UHS counters that the jury's verdict was well-founded, and that Dr. King failed to establish the terms or existence of a valid oral contract.

Dr. King argues that the evidence she presented, taken together, meets the requirements for establishing a breach of contract.   Under Louisiana law, "an oral contract for more than five hundred dollars may be proved by the testimony of 'one witness and other corroborating circumstances.'" *Meredith v. La. Fed'n of Teachers*, 209 F.3d 398, 403 (5th Cir. 2000) (quoting LA. CIV. CODE art. 1846).   A credible plaintiff suing under an alleged oral contract may serve as her own witness.   *Id.*   "[T]he jury is in the best position to evaluate the evidence and to assess the credibility of witnesses." *Ham Marine, Inc. v. Dresser Indus., Inc.*, 72 F.3d 454, 461 (5th Cir. 1995).

Dr. King misunderstands our standard of review.   It is not enough for her to show that she presented evidence sufficient to support a verdict in her favor. She must show that it was a manifest miscarriage of justice for the jury to find otherwise.   The jury, however, had numerous plausible grounds on which it could have concluded that Dr. King failed to prove her case.   The jury may have

discretion in the court's finding it inadmissible.

9

No. 09-30794

found Dr. King's testimony lacked credibility. It may have found that the "corroborating circumstances" on which she relied were more consistent with UHS's explanation of events. Our role on plain error review is not to re-weigh the evidence, but merely to assure that any manifest miscarriage of justice is avoided. Dr. King has not shown that a manifest miscarriage of justice will result if the jury's verdict is allowed to stand.

IV

UHS argues that the jury plainly erred in concluding that Dr. King was entitled to unpaid wages. It argues that the jury's finding that Dr. King was owed $32,700 in unpaid wages is contrary to the facts and to the jury's own findings. Dr. King responds that the jury's verdict was supported by the record and that, in any event, its conclusion was not plain error.

The LWPS provides an employee who has resigned or been terminated a statutory cause of action if her employer fails or refuses to pay any unpaid wages she earned during her time of employment. LA. REV. STAT. ANN. § 23:631. An employee's LWPS cause of action is separate and apart from her traditional contract remedies, and violations of the LWPS may subject the employer to penalties well beyond the wages owed under the employment contract. *See* LA. REV. STAT. ANN. § 23:632; *Boudreaux v. Hamilton Med. Grp., Inc.*, 644 So. 2d 619, 623 (La. 1994) (holding that LWPS is inapplicable but remanding for consideration of contract claim). Nevertheless, an employee's contractual terms of employment are central to an LWPS claim. The LWPS only requires an employer to pay the compensation "due under the terms of employment." LA. REV. STAT. ANN. § 23:631(A)(1)(a)-(b). As such, payments that are "not provided for by the employment contract" are "thus not governed by the provisions of" the LWPS. *Rutledge v. CRC Holston, Inc.*, 425 So. 2d 364, 366 (La. Ct. App. 1982), *writ denied*, 429 So. 2d 147 (1983).

On the jury form, the jury answered "no" when asked whether it found that UHS "breached a valid oral contract with Dr. King regarding payment for extra hours worked after Hurricane Katrina and that such breach was a proximate cause of damage to Dr. King." A jury's "[a]nswers should be considered inconsistent . . . only if there is no way to reconcile them." *Willard v. John Hayward*, 577 F.2d 1009, 1011 (5th Cir. 1978); *see also Ellis v. Weasler Eng'g Inc.*, 258 F.3d 326, 343 (5th Cir. 2001) ("We are required under the Seventh Amendment to make a concerted effort to reconcile apparent inconsistencies in answers to special verdicts if at all possible." (citations omitted)). If possible, therefore, we must construe the jury's LWPS verdict as consistent with its oral contract conclusion—that is to say, we must construe the LWPS verdict as based on some obligation other than the oral contract that the jury rejected. Acknowledging this limitation, Dr. King argues that while the jury did not find that there was an oral agreement to pay King $150 per hour, the jury did find that there was a separate agreement to pay $33,000 for extra hours worked, which was paid to other doctors. That reading of the verdict is consistent with the LWPS damages award.

Dr. King's LWPS award must stand, therefore, unless the jury plainly erred in concluding that UHS was obligated under a separate agreement, other than the original alleged oral contract, to pay Dr. King for her extra work. Based on our review of the record, there is no factual support for such a conclusion. Dr. King cannot claim rights under contract addenda that she openly rejected. Although Dr. King's signature does appear on one addendum, it is undisputed that that addendum was never signed by a representative of UHS, and it appears that the signed addendum was likely never returned to UHS. There is no evidence of any completed oral contract to pay Dr. King the bonus—to the contrary, the bonus was always plainly tied to the execution of a written contract. Recovery under the LWPS must be premised on some

No. 09-30794

identifiable obligation. Because the jury's conclusion that such an obligation existed cannot be justified based on the record, we are compelled to find plain error.[3]

V

UHS argues that the jury's conclusion that UHS violated the EPA was plainly erroneous. UHS posits that Dr. King did not receive the bonus because she refused to sign an extension with UHS. It argues that Dr. Mascia, the doctor who was paid a bonus without signing the extension, is not an appropriate comparator to Dr. King, and that, even if he is an otherwise apt comparator, he was paid because UHS believed he would sign the extension, not because of his difference in sex. Dr. King responds that Dr. Mascia is an appropriate comparator, that UHS has not demonstrated that it paid Dr. Mascia differently for any of the reasons sanctioned by the EPA, and that the jury's verdict was, in any event, not plainly erroneous.

> The EPA prohibits an employer from discriminating by
>
> paying wages to employees [in a covered establishment] at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex . . . .

29 U.S.C. § 206(d). "Once a plaintiff has made her prima facie case by showing that an employer compensates employees differently for equal work, the burden shifts to the defendant to" show by a preponderance of the evidence that the

---

[3] Accordingly, we are not required to determine whether the district court's jury instructions stated the definition of "wages" overly broadly or whether the jury was wrongly instructed with regard to the possibility of formation of an oral contract.

differential in pay was made pursuant to one of the four enumerated exceptions. *Siler-Khodr v. Univ. of Tex. Health Sci. Ctr. San Antonio*, 261 F.3d 542, 546 (5th Cir. 2001).

At the core of the parties' disagreement is whether the bonus that UHS paid Dr. Mascia can be fairly compared to UHS's refusal to pay a similar bonus to Dr. King.  UHS argues first that Dr. Mascia is himself an inappropriate comparator to Dr. King because their jobs were not comparable, as required by the EPA.  UHS notes that, although both Dr. Mascia and Dr. King were anesthesiologists in title, Dr. Mascia had certifications and qualifications that Dr. King did not.  Be that as it may, Dr. Mascia's qualifications, in and of themselves, are irrelevant to whether Drs. King and Mascia performed "equal work on jobs the performance of which requires equal skill, effort, and responsibility," § 206(d).  That inquiry looks to the "actual job requirements and performance." 29 C.F.R. § 1620.13(e).  It was not plainly erroneous, based on the record, to conclude that the performance of Drs. Mascia and King's jobs required equal skill, effort, and responsibility.  The determinative issue, therefore, is whether it was plain error not to conclude that the bonus was awarded to Dr. Mascia but not Dr. King for one of the reasons permitted under the EPA: "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex."  § 206(d).

As with the jury's oral contract and LWPS verdicts, we must construe the jury's Title VII and EPA verdicts consistently, if possible.  The jury answered "no" when asked, "Do you find by a preponderance of the evidence that defendant, University Healthcare System, L.C., discriminated against plaintiff, Angela King, M.D., because of her sex and that such discrimination was a proximate cause of damage to Dr. King?"  That answer seems, at least on first reading, in tension with a finding of EPA liability: the jury found that Dr. King

failed to show that UHS "discriminated against [Dr. King] because of her sex," resulting in damages; yet it found EPA liability, which, by definition, must have been premised on the conclusion that UHS "discriminate[d] . . . between employees on the basis of sex by paying [Dr. King] wages . . . at a rate less than the rate at which [it paid] wages to employees of the opposite sex . . . where such payment [was not] made pursuant to . . . a differential based on any other factor other than sex," § 206(d).

The allocation of burdens in EPA and Title VII claims, however, differ in a way that may, in some cases, result in an employee prevailing on her EPA claim but not her Title VII claim. Specifically, where a plaintiff makes an adequate prima facie case for both an EPA and a Title VII claim, the defendant bears the burden of *persuasion* to prove a defense under the EPA, whereas it has only a burden of *production* to show a legitimate nondiscriminatory reason for its actions under Title VII, with the ultimate burden of persuasion remaining with the plaintiff. *Plemer v. Parsons-Gilbane*, 713 F.2d 1127, 1136-37 (5th Cir. 1983). As such, where the defendant proffers a reason for its pay differential other than sex, but does not prove that reason by a preponderance of the evidence, the plaintiff will succeed on an EPA claim while still bearing the burden of persuasion under Title VII. *Id.* The district court's charge to the jury highlighted this difference in burdens. The jury was told that Dr. King bore the burden of showing that UHS discriminated against her because of her sex under Title VII, but that UHS bore the burden of proving the "any other factor other than sex" defense under the EPA.

Reviewing only for plain error, we conclude that the jury's verdict does not work a manifest miscarriage of justice. Plain error review looks only to "whether there is *any* evidence to support the jury's verdict in favor of the plaintiff." *Adames v. Perez*, 331 F.3d 508, 511 (5th Cir. 2003) (citation omitted). Because King has presented evidence adequate to establish a pay differential with an

No. 09-30794

appropriate comparator, Dr. Mascia, the jury was within its discretion to conclude that UHS bore the burden of establishing an affirmative defense. UHS's evidence supporting its affirmative defense consisted chiefly of testimony of UHS employees who stated that Dr. Mascia was paid the bonus because they believed he was returning. The jury's broad authority permitted it to conclude that the testimony offered by UHS was not credible and that UHS simply failed to carry its burden.

VI

A

Lastly, we turn to damages and attorney's fees. UHS argues first that the district court erred in granting Dr. King liquidated damages on her EPA claim. It argues that any EPA violation arose out of actions UHS undertook in good faith, and that the district court therefore should not have ordered liquidated damages. Dr. King responds that UHS did not carry its burden to show good faith and that, even if it did, the district court was within its discretion to order liquidated damages. Where a statute authorizes liquidated damages against a defendant who lacked good faith, this Court reviews the district court's decision for abuse of discretion. *Singer v. City of Waco*, 324 F.3d 813, 823 (5th Cir. 2003).

UHS and Dr. King agree that unless an employer can demonstrate that it violated the EPA in good faith and with reasonable grounds for believing it was not violating the Act, an award of liquidated damages is mandatory. 29 U.S.C. § 216(b); *Lowe v. Southmark Corp.*, 998 F.2d 335, 337 (5th Cir. 1993). Once the employer has made a showing of good faith, *see* 29 U.S.C. § 260, the district court has "discretion to award an amount of liquidated damages less than the amount awarded in back pay and retaliation damages." *Lowe*, 998 F.2d at 337. To qualify for the "good faith" defense, a defendant must show that its culpable act or omission "was based upon reasonable grounds for believing that [the defendant] was not violating the Act." *Id.*

15

The district court held that UHS failed to carry its burden of showing good faith; accordingly, the district court never considered whether to reduce Dr. King's liquidated damages award. The district court based its conclusion on a credibility determination with regard to UHS's witnesses, writing:

> The principal evidence concerning the alleged good faith/reasonable belief explanation for defendant's conduct came from defendant's employees . . . . Obviously, the jury did not accept this testimony in connection with its separate finding concerning defendant's argument that its payment of the bonus to Dr. Mascia was made pursuant to a differential based on any other factor other than sex. I similarly reject the testimony for purposes of establishing a basis for avoiding imposition of liquidated damages.

(Citation omitted.) UHS argues first that this analysis improperly deferred to the jury's finding of culpability, effectively abdicating the district court's responsibility to make its own good faith determination. UHS's account is belied by the court's own language stressing that good faith was reserved for the judge's determination, not the jury's, and explaining the holding in terms of the court's own credibility determinations.

UHS argues next that the district court's conclusion was premised on the erroneous assumption that Ryan—whom the district court did find to be "generally credible"—did not, in the district court's words, have "the principal logistical role and responsibility for dealing with the anesthesiologists in connection with the relevant contract and bonus documentation." The record is not altogether clear with regard to the details of UHS's internal decision-making about its payments to Drs. Mascia and King. Based on the evidence available, we cannot conclude that the district court abused its discretion in holding that UHS did not carry its burden of showing good faith. The award of liquidated damages must stand.

No. 09-30794

B

UHS challenges the award of attorney's fees under the LWPS and EPA only insofar as it challenges the respective verdicts on those counts. Because we reverse the judgment against UHS under the LWPS, we also hold, of course, that Dr. King is unable to recover attorney's fees thereunder. By the same token, because we affirm the district court's EPA award, Dr. King is still entitled to recover fees under that statute. *See* 29 U.S.C. § 216(b) ("The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant . . . ."). While the district court apparently followed a fairly simple rule of allocating 20% of the fees to each claim, it has never fully accounted for how much of its award is attributable to the EPA claim alone, how much to the LWPS claim, and how much overlap there may have been between the two. *Cf. Fox v. Vice*, No. 10-114, slip op. at 8-11 (U.S. June 6, 2011) (highlighting need to separate fees that are associated with claims for which recovery is permitted from fees that are not). Remand is therefore appropriate on this issue.[4]

C

Dr. King argues that the district court erred in concluding that UHS was entitled to recover attorney's fees under her original employment contract. She argues that her employment contract only empowered UHS to recover attorney's fees in lawsuits based on alleged breaches of that contract itself, whereas she sued under a separate alleged later oral contract. Section 12.3 of the written agreement states that if either party is "required to enforce the terms of this Agreement . . . the prevailing party shall be entitled to recover the costs of such action, including, but not limited to a reasonable attorney's fee."

---

[4] Because we remand for the purposes of apportionment of fees between the claims anyway, we agree with UHS that the best course of action is for the district court to apportion fees on appeal as well.

17

Dr. King's argument is without merit.  It is undisputed that Dr. King's employment by UHS was, at all times relevant to this litigation, governed by her written employment agreement.  It is further undisputed that that agreement contained both (1) terms setting forth how King would be compensated and (2) a clause setting forth how the contract could be amended.  Dr. King has never shown that her employment contract was superseded in full.  She has, at most, alleged subsequent supplemental agreements that would have operated in conjunction with—and made little, if any, sense outside the context of—the terms of the written contract.  In such a circumstance, the district court was correct in concluding that King's litigation "required [UHS] to enforce the terms of" the written employment agreement.

Dr. King argues that the district court's parol evidence ruling is inconsistent with the conclusion that UHS was enforcing its written contract with Dr. King.  As we have explained, however, the decision to admit parol evidence in an effort to show the existence of a later agreement is by no means the equivalent of a substantive ruling that the parties' original contract is irrelevant to the conflict at issue.  "Louisiana's parol evidence rule is not substantive law, but a rule of evidence." *Dugas v. Modular Quarters, Inc.*, 561 So. 2d 192, 196 (La. Ct. App.1990); *see also Bass*, 671 So. 2d at 353.  The district court's ruling that Dr. King could present parol evidence did not render her written contract with UHS irrelevant or non-determinative.  UHS successfully enforced the contract in that it both enforced the integration clause and enforced the compensation provisions as the governing statements of Dr. King's rate of compensation.  The district court's award of attorney's fees under the contract was not in error.

## D

Finally, we turn to a third-party motion that has been filed with regard to the attorney's fees in this case.  The law firm of Coats Rose Yale Ryman & Lee

No. 09-30794

("Coats Rose"), which was Dr. King's trial counsel, has moved for leave to assert a privilege on the district court's judgment for the amount of attorney's fees incurred on behalf of Dr. King.   Coats Rose relies on  LA. REV. STAT. ANN. § 9:5001, which provides a "special privilege" for "attorneys at law for the amount of their professional fees on all judgments obtained by them" permitting them "to take rank as a first privilege thereon superior to all other privileges and security interests under Chapter 9 of the Louisiana Commercial Laws."  Dr. King opposes the motion, arguing that there is no factual record involving her conflict with Coats Rose and that a motion to this court was not the appropriate mechanism for enforcing the firm's rights under LA. REV. STAT. ANN. § 9:5001. We ordered Coats Rose to respond, and in its response it recharacterizes its motion as "the functional equivalent of requesting to intervene," and now apparently seeks to be treated as an intervenor.

Dr. King's argument is well-taken.  Despite Coats Rose's late-arising attempt to recast events, its motion made no mention of intervention and offered no argument that it was an appropriate intervenor.  *Cf.* FED. R. CIV. P. 24(c) (providing that a motion to intervene must "state the grounds for intervention and be accompanied by a pleading that sets out the claim or defense for which intervention is sought").  Rather, the firm, a non-party, merely filed a largely unexplained motion asking us to enforce a statutory privilege in its favor.  That motion was not an adequate motion to intervene and should therefore be denied. We express no position as to whether intervention would be appropriate following remand.

## VII

In summary, the district court's award in favor of Dr. King under the Louisiana Wage Payment Statute is REVERSED and the judgment VACATED as to that claim.  The award of attorney's fees related to the Louisiana Wage Payment Statute claim to Dr. King is REVERSED, and the judgment is

19

VACATED as to the amount of the fees awarded. In all other respects, the judgment of the district court is AFFIRMED. The case is REMANDED to the district court for a determination of the amount of attorney's fees attributable to Dr. King's Equal Pay Act claim. Coats Rose Yale Ryman & Lee's Motion for Leave to Assert Privilege for Attorneys' Fees and Costs on Judgment is DENIED without prejudice to asserting the rights claimed therein by other means.