**Alicia Danielle ZEIGLER and Monique M. Varnado, Plaintiffs**

v.

**UNIVERSITY OF MISSISSIPPI MEDICAL CENTER, Defendant.**

**Civil Action No. 3:11CV51TSL–MTP.**

United States District Court, S.D. Mississippi, Jackson Division.

May 4, 2012.

Bethany Brantley Johnson, Strategic Employment Solutions, LLC, Jackson, MS, for Plaintiff.

John T. Kitchens, Mark D. Ray, Simine Bazyari Reed, Thomas E. Whitfield, Jr. Kitchens Hardwick Ray & Whitfield, PLLC, Brandon, MS, for Defendant.

## MEMORANDUM OPINION AND ORDER

TOM S. LEE, District Judge.

Plaintiffs in this case, Alicia Danielle Zeigler and Monique M. Varnado, were both terminated from their employment as cytotechnologists with the University of Mississippi Medical Center (UMMC) in December 2009. Following their terminations, plaintiffs filed the present action alleging claims under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.,* for race and gender discrimination and for retaliation;[1] for retaliation in violation of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201, *et seq.;* under 42 U.S.C. § 1983 for violation of their due process rights; and under state law for wrongful termination, intentional infliction of emotional distress, breach of implied covenant of good faith and fair dealing, and defamation. UMMC has moved pursuant to Federal Rule of Civil Procedure 56 for summary judgment as to each of these claims. In response, plaintiff Varnado has conceded her race discrimination claim, and both plaintiffs conceded their due process claim and their state law claims for intentional infliction of emotional distress and breach of the implied covenant of good faith. As to the remaining claims, the court has carefully and thoroughly reviewed and considered the parties' memoranda of authorities and accompanying attachments, and concludes that the motion should be denied as to plaintiffs' Title VII claim for retaliation, but should be granted on all other claims.

*Gender Discrimination*

Plaintiffs Monique Varnado and Danielle Ziegler became employed by UMMC as

1. Only Varnado, who is African–American, sued for race discrimination.

cytotechnologists in 1996 and 1998, respectively,[2] and continued in that capacity until their terminations in December 2009. Their gender discrimination claim in this case is based on allegations that Ric Bowlin, the sole male cytotechnologist in the cytopathology lab, was given more favorable treatment than the female cytotechnologists in several respects. For example, whereas female cytotechnologists worked in cubicles, Bowlin had his own office; Bowlin, alone, had business cards; Bowlin was given travel opportunities; among the cytotechnologists, only Bowlin was given supervisory duties; and Bowlin was allowed to accumulate substantial overtime, whereas plaintiffs and the other female cytotechnologists were denied the opportunity for overtime.

■■■ Under the applicable *McDonnell Douglas* framework, plaintiffs have the initial burden to establish a *prima facie* case of gender discrimination, which requires each to show: (1) that she is a member of a protected class; (2) that she was qualified for the position; (3) that she suffered an adverse employment action; and (4) that she was replaced by someone outside the protected class or that similarly-situated employees outside the protected class were more favorably treated. *Bugos v. Ricoh Corp.,* No. 07–20757, 2008 WL 3876548, *3 (5th Cir. Aug. 21, 2008) (citing *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.,* 245 F.3d 507, 512–13 (5th Cir. 2001)). Once plaintiffs establish a prima facie case, "the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the disparate treatment." *Id.* (citing *Machinchick v. PB Power, Inc.,* 398 F.3d 345, 356 (5th Cir. 2005)). If the employer comes forward with legitimate nondiscriminatory reasons for the adverse employment action, plain-

tiffs must then prove (1) that the reasons proffered were false and were thus a pretext for discrimination or (2) that even if the reasons are true, gender was a motivating factor. *Id.* (citing *Machinchick,* 398 F.3d at 356). Plaintiffs can meet this burden " 'by producing circumstantial evidence sufficient to create a fact issue as to whether the employer's non-discriminatory reasons are merely pretext for discrimination.' " *Id.* (quoting *Machinchick,* 398 F.3d at 354).

UMMC submits that plaintiffs cannot establish a *prima facie* case of discrimination, and even if they could, that they cannot establish pretext. In the court's opinion, UMMC is entitled to summary judgment on this claim because plaintiffs have failed to come forward with proof to demonstrate that defendant's articulated legitimate nondiscriminatory reason is pretext for gender discrimination. Clearly plaintiffs can satisfy the first two elements of their *prima facie* case: they are female and, having been employed by UMMC as cytotechnologists for a number of years during which they received favorable evaluations, obviously were qualified for their positions. Moreover, contrary to UMMC's urging, plaintiffs have alleged and offered proof that they suffered an adverse employment action, namely, a denial of the opportunity for overtime and accompanying compensation. *See Johnson v. Manpower Prof'l Servs., Inc.,* 442 Fed.Appx. 977, 982 (5th Cir.2011) (holding that "[d]enial of overtime pay is an adverse employment action because it relates to … compensation"); *Shannon v. BellSouth Telecomms., Inc.,* 292 F.3d 712, 716 (11th Cir.2002) (holding that denial of the opportunity to work overtime is an adverse employment action sufficient to

---

**2.** According to defendant's job description, a cytotechnologist's job is "to diagnose gyneco-logical and non-gynecological specimens for cellular abnormalities via microscope."

make out a prima facie case under Title VII) (cited in *Johnson*).

As to the fourth element, UMMC contends plaintiffs cannot show that Bowlin, who indisputably received more favorable treatment than plaintiffs, was similarly situated to them. It contends that, in fact, Bowlin was not similarly situated because he, unlike plaintiffs and the other female cytotechnologists, functioned in a more or less de facto supervisory capacity and as such, had far different job duties. In response, plaintiffs do not deny that Bowlin was allowed to function as a pseudo supervisor and was accorded various perks (including overtime) associated with that role. However, plaintiffs suggest that Bowlin was likely tapped for this supervisory-type position, and allowed to remain in that position, because of his gender.

 In the court's opinion, even if plaintiffs could raise a fact issue as to the fourth element of their *prima facie* case, UMMC is nevertheless entitled to summary judgment because it has offered a legitimate nondiscriminatory reason for Bowlin's being allowed to accumulate overtime; and plaintiffs have not raised a genuine issue of material fact on the question whether this reason was pretext for discrimination.

 In support of its motion, UMMC explains that Bowlin had more experience in the lab than anyone else, indeed, even more than the director of the department. He was involved in the start-up of the department and, due to his accumulation of experience and knowledge, was looked to as the problem solver for the department. Thus, in 2003, the then-director of the department assigned to Bowlin a supervisory role, which Bowlin continued to

perform over the years. As UMMC has proffered a legitimate nondiscriminatory reason for Bowlin's more favorable treatment, it falls to plaintiffs to establish pretext by showing that UMMC's proffered reason is "false" or "unworthy of credence." *See Vaughn v. Woodforest Bank,* 665 F.3d 632, 637 (5th Cir.2011) (internal quotation marks and citation omitted).[3] To prove pretext, the plaintiff must rebut the non-discriminatory reason with "substantial evidence." *Laxton v. Gap Inc.,* 333 F.3d 572, 578 (5th Cir.2003). Plaintiffs have failed to come forward with evidence to sustain this burden. Plaintiffs have made clear they believe that Bowlin was allowed to act as pseudo-supervisor because Dr. Mithra Baliga, Director of Cytopathology, and Rhonda Alexander, Chief Cytotechnologist, "had more trust in a man." However, as the Fifth Circuit has repeatedly made clear, a plaintiff does not sustain her burden to prove pretext with proof of nothing more than her subjective belief that discrimination was involved. *See, e.g., Pennington v. Texas Dept. of Family and Protective Servs.,* 469 Fed. Appx. 332, 339 (5th Cir.2012) (employee's "subjective belief that she was the victim of retaliation, even if that belief is genuine, is insufficient to carry her case without further evidence of pretext"); *Roberson v. Alltel Information Servs.,* 373 F.3d 647, 654 (5th Cir.2004) (plaintiff's "subjective belief that [he] was not selected for the [ ] position based upon race or age is [ ] insufficient to create an inference of the defendants' discriminatory intent")(internal quotations and citations omitted). In the absence of proof to cast doubt on UMMC's proffered reason for Bowlin's more favorable treatment, the court concludes that plaintiff's gender discrimination fails.

---

**3.** The court notes that UMMC is only required to proffer a reason for its differential treatment; *it is not required to prove that reason* by a preponderance of the evidence. *See King v. University Healthcare Sys., L.C.,* 645 F.3d 713, 724 (5th Cir.2011).

*Title VII Retaliation*

 Plaintiffs allege they were terminated in retaliation for complaining of what they reasonably perceived to be gender discrimination. An employer may not discriminate against an employee because the employee "has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e–3. Under the *McDonnell Douglas* framework, "[a] plaintiff establishes a *prima facie* case of retaliation by showing (i) [she] engaged in a protected activity, (ii) an adverse employment action occurred, and (iii) there was a causal link between the protected activity and the adverse employment action." *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 657 (5th Cir. 2012) (citation omitted). "If the plaintiff successfully presents a prima facie case, the burden shifts to the employer to provide a 'legitimate, non-retaliatory reason for the adverse employment action.'" *Id.* "If the defendant presents evidence that supports that it acted properly, the factfinder must decide whether retaliation was the but-for cause for the employer's action." *Id.*

It is undisputed that in December 2008, plaintiffs began complaining to their supervisors and human resources representatives about preferential treatment of Ric Bowlin. On October 15, 2009, Varnado filed a "personal complaint/grievance" alleging sex discrimination, and in November 2009, both plaintiffs complained of perceived gender discrimination to interim Human Resources Director Jeff Walker. Less than a month later, both were terminated.

 UMMC submits that even if plaintiffs were originally engaged in protected activity, they lost the protection of Title VII due to their "unending complaints" and "hostile tactics" which were overly aggressive and overtly disruptive. *See Smith v. Texas Dep't of Water Res.*, 818 F.2d 363, 366 (5th Cir.1987) (stating that the opposition clause "was not intended to immunize insubordinate, disruptive, or nonproductive behavior at work") (citation omitted); *Equal Employment Opportunity Com'n v. Mike Hooks, Inc.*, No. 2:09 CV477, 2011 WL 1807369, *16 (W.D.La. May 11, 2011) (stating that "[w]hen an employee engages in protected activity in order to achieve a purely ulterior motive or uses improper means, such as violating company policy or using aggressive and overtly disruptive activities, to pursue a complaint of discrimination, and those actions interfere with the business of the employer, the employee has not engaged in protected activity"). "For the employee's conduct to fall under the ambit of 'protected activity,' it must be "reasonable in light of the circumstances" and must not be 'unjustifiably detrimental to the employer's interest.'" *Mike Hooks, Inc.*, 2011 WL 1807369, at *16 (quoting *Douglas v. DynMcDermott Petroleum Ops. Co.*, 144 F.3d 364, 373 (5th Cir.1998)). In the court's opinion, UMMC has failed to demonstrate as a matter of law, based on undisputed facts, that plaintiffs' conduct was unreasonable in light of the circumstances. That is, UMMC has failed to establish that there is no genuine issue of material fact as to whether plaintiffs engaged in protected activity.

Defendant contends, alternatively, that plaintiffs cannot prove a causal link between their alleged protected activity and their terminations, since the evidence clearly establishes that plaintiffs were fired for legitimate, nonretaliatory reasons, namely these: (1) in December 2009, they sent an email to newly-installed Human Resources Director Michael Estes in which

they falsely reported that former interim Human Resources Director Jeff Walker had failed to address their complaints regarding various employment-related issues; and (2) plaintiffs' activities and behavior had caused animosity within their department that compromised patient care and created a hostile work environment. Defendant submits that plaintiffs can establish neither their *prima facie* case nor that UMMC's proffered reasons for their terminations are pretext for retaliation.

■ In the court's opinion, the evidence reflects a genuine issue of material fact as to causation, and as to pretext. In the court's opinion, plaintiffs have at least created an issue of fact as to whether the first of defendant's proffered reasons was false. In fact, the evidence shows that neither plaintiff sent an email to *Estes*. Rather, on December 2, 2009, plaintiff Zeigler sent an email to Cathy Smith in the Human Resources Department in which she wrote, "My coworker [Monique Varnado] and I met with [Jeff Walker] on Oct. 15, 2009 and gave him information to read.... He did not address the many issues and questions we asked. [He] completely evaded the 2 biggest concerns...." This was followed by a series of emails between Smith and Zeigler, and ultimately, it seems Smith forwarded Zeigler's emails to Estes.

UMMC contends that Zeigler's email(s) gave Estes the impression that Jeff Walker had failed to address the issues plaintiffs had raised, when in fact, Walker had done so. Plaintiffs, on the other hand,

point out that Zeigler sent the email(s), not Varnado (who knew nothing about it); that she sent the email(s) to Smith; and they claim that no statement in the email(s) was false. According to plaintiffs, while Walker had purported to respond to their complaints, his response was limited to only a few issues and was altogether inadequate, so that he did, in fact, indeed fail to address "the many issues" they had raised. The court considers that a jury could fairly conclude that this reason given by UMMC for terminating both plaintiffs was contrived; and this, considering in the light of all the evidence and the circumstances of plaintiffs' terminations, might also reasonably be viewed as casting doubt on defendant's second reason for plaintiffs' terminations.

According to UMMC, plaintiffs had engaged in activities which had caused substantial disruption and animosity within the cytology department, which in turn compromised patient care. Plaintiffs flatly deny that they were responsible for any disruption or hostility, and claim that on the contrary, they were the targets of hostility from their managers and coworkers. The court is unable to conclude on the record before it that plaintiffs caused disruption in the department, for which they were allegedly fired.[4]

For these reasons, the court concludes that defendant's motion should be denied as to plaintiff's Title VII retaliation claim.

*FLSA Retaliation*

■ Plaintiffs allege they were terminated in retaliation for reporting FLSA

---

4. The evidence does establish that employees in the department sought and were granted a meeting with Connie Suber, Human Resources Business Partner, in which they complained about plaintiffs. Suber, in turn, reported the employees' complaints to Barbara Smith Watson, who made the decision to terminate plaintiffs' employment. The court notes that while Smith relates their com-plaints in her affidavit stating the reasons for plaintiffs' terminations, she does not attest that she actually believed the employees' complaints were true or well-founded, and UMMC does not base its motion on Smith Watson's *perception* of a basis for termination, as opposed to the facts actually existing to support plaintiffs' terminations.

violations. "The FLSA makes it unlawful for anyone to 'discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to the FLSA.'" *Johnson,* 442 Fed.Appx. at 983 (quoting 29 U.S.C. § 215(a)(3)). To establish a *prima facie* case of retaliation under the FLSA, a plaintiff must prove the following: "(1) participation in statutorily protected activity; (2) an adverse employment action; and (3) a causal link between the activity and the adverse action." *Hagan v. Echostar Satellite L.L.C.,* 529 F.3d 617, 624 (5th Cir.2008). UMMC seeks dismissal of plaintiffs' retaliatory termination claim under the FLSA, arguing that plaintiffs have failed to demonstrate a causal link between their protected activity and their terminations.

It is undisputed that in December 2008, plaintiffs reported to UMMC administrators that their immediate supervisor, Rhonda Alexander, required employees in the cytotechnology lab to work "off the clock" if they failed to complete their daily assignments within their scheduled work hours. Based on plaintiffs' complaints, UMMC disciplined Alexander in February 2009, and directed that she immediately discontinue this practice.

In support of their retaliation claim, plaintiffs contend that Alexander was extremely angry at them for raising the FLSA complaints and began nitpicking their job performance, recording every single "error" she could find on them, despite their stellar performance history prior to that time. Plaintiffs conclude that Alexander's actions raise a question as to whether their protected activity was a motivating factor in their terminations. The court is not persuaded.

First, plaintiffs' terminations came a full year after they reported the FLSA violation, so that temporal proximity is lacking. Moreover, UMMC did not purport to terminate plaintiffs for any performance deficiencies observed or noted by Alexander. Lastly, there is nothing to indicate that Alexander had any role or influence in the decision to terminate plaintiffs' employment; the decision was instead made by Barbara Smith Watson. In short, there is no evidence that would suggest any causal connection between plaintiffs' reporting of FLSA violations and their terminations and summary judgment will be granted on this claim.

*State law Wrongful Termination*

In October 2009, plaintiffs complained to The Centers for Medicare & Medicaid Services (CMS) that an annual proficiency examination required by the Clinical Laboratory Improvement Amendments (CLIA), 42 U.S.C. § 263a,[5] to be administered to UMMC's cytotechnologists had been improperly proctored. CMS investigated and found that the examination had been improperly proctored and required a retest, which was administered on December 7, 2009. Plaintiff Zeigler was fired on December 9, 2009, and Varnado a week later when she returned from vacation. Plaintiffs allege they were terminated in retaliation for reporting UMMC's "unlawful conduct" in improperly proctoring the proficiency examination.

**5.** The Centers for Medicare & Medicaid Services (CMS) regulates all laboratory testing (except research) performed on humans in the United States through the Clinical Laboratory Improvement Amendments (CLIA), the objective of which is to ensure quality laboratory testing. *See* 42 U.S.C. § 263a, and its implementing regulations. All clinical laboratories must be certified to receive Medicare or Medicaid payments. *Wade Pediatrics v. Dep't of Health and Human Servs.,* 567 F.3d 1202, 1203 (10th Cir.2009).

"Mississippi is an employment-at-will state that follows the common law rule that one who is under a contract of employment for an indefinite term may quit or may be terminated at the will of the employer. '[E]ither the employer or the employee may have a good reason, a wrong reason, or no reason for terminating the employment contract.'" *Kyle v. Circus Circus Mississippi, Inc.*, 430 Fed.Appx. 247, 250 (5th Cir.2011) (quoting *Kelly v. Miss. Valley Gas Co.*, 397 So.2d 874, 874–75 (Miss.1981)). However, in *McArn v. Allied Bruce–Terminix Co., Inc.*, 626 So.2d 603 (Miss.1993), the Mississippi Supreme Court carved out "a narrow public policy exception" to the employment-at-will doctrine, holding that regardless of whether the employment is at-will,

> (1) an employee who refuses to participate in an illegal act as in *Laws* [*v. Aetna Finance Co.*, 667 F.Supp. 342 (N.D.Miss.1987)], shall not be barred by the common law rule of employment at will from bringing an action in tort for damages against his employer; (2) an employee who is discharged for reporting illegal acts of his employer to the employer or anyone else is not barred by the employment at will doctrine from bringing action in tort for damages against his employer.

*McArn*, 626 So.2d at 607.

UMMC contends that plaintiffs have no viable claim for wrongful (retaliatory) termination under *McArn* since the activity of which plaintiffs complained to CMS—improper proctoring of the proficiency examination—was not criminal activity. UMMC points out that CLIA provides primarily for civil fines for certain noncompliance, *see* 42 C.F.R. Ch. IV § 493.1806; criminal sanctions are only available for individuals who intentionally violate CLIA, *see id.* § 493.1806(e) ("(e) Criminal sanctions: Under section 353(1) of the PHS Act, an individual who is convicted of intentionally violating any CLIA requirements may be imprisoned or fined."). UMMC contends that since there is no proof of an intentional violation, plaintiffs' claim fails. Plaintiffs respond that the issue is not whether or not "its supervisor ... intentionally violate[d] CLIA," but rather is whether plaintiffs' reporting "of what may have been criminally illegal conduct" was a motivating factor in the decision to terminate their employment. In fact, however, the issue is precisely that identified by defendant.

The Fifth Circuit held in *Wheeler v. BL Development Corp.*, that *McArn* applies only where the conduct reported is "actually ... criminal in nature." 415 F.3d 399, 402–04 (5th Cir.2005). *See id.* at 404 (holding that because the activity reported "did not constitute any form of criminally illegal activity ... *McArn's* 'narrow public policy exception' is not applicable in this instance"). An employee's good faith effort in reporting what she believes may be illegal activity will not support a claim, if the activity is not, in fact, illegal. Thus, the burden is on the employee to prove that the activity reported was illegal. *Id.* at 403 (holding that "district court did not err when it determined that Appellants are precluded from recovering under the [*McArn*] exception because they have failed to come forth with evidence establishing that the [act reported] itself constituted criminal activity"); *see also Kyle*, 430 Fed.Appx. at 250–51 (reaffirming *Wheeler*); *Hammons v. Fleetwood Homes of Mississippi, Inc.*, 907 So.2d 357, 360 (Miss.Ct.App.2004) (holding the McArn exception "require[s] that the acts complained of warrant the imposition of criminal penalties, as opposed to mere civil penalties"). As plaintiffs have presented no evidence to prove that any CLIA violation was intentional, their claim under *McArn* cannot succeed.

## Defamation

Following their terminations, both plaintiffs asserted claims for unemployment benefits with the Mississippi Department of Employment Security (MDES). Plaintiffs assert a claim for defamation, alleging that "Defendant, through its employees, provided false statements maliciously during a hearing on Plaintiffs' unemployment benefits for the purposes of causing a denial of said benefits," and that UMMC defamed them providing "false in fact information to MDES (during the hearing on their claims for unemployment benefits) for the purpose of causing a denial of Plaintiffs' unemployment benefits." In their complaint, plaintiffs do not identify any false statement allegedly made, or "false in fact information" allegedly presented to MDES.[6] In their response to the motion, they broadly claim there were "many, many flatly false statements made by UMMC representatives during the hours of testimony," a few examples of which were statements by Alexander in her testimony that Zeigler sent her "endless inappropriate emails asking for help"; that both plaintiffs spent too much time emailing and document building which took them "away from screening" and "took their minds away from patient care"; and that plaintiffs were "unwilling to be managed."

 It is clear plaintiffs cannot present a cognizable claim for defamation against UMMC. It appears from plaintiffs' complaint their defamation claim is based on statements of UMMC employees during the hearing on plaintiffs' claim for unemployment benefits. The Mississippi Tort Claims Act (MTCA), Miss.Code Ann. § 11–46–1, et seq., which is the "exclusive remedy for the state law civil claims against a governmental entity and its employees," Elkins v. McKenzie, 865 So.2d 1065, 1078 (Miss.2003), waives UMMC's immunity only for certain torts of its employees committed in the course and scope of their employment, see Miss.Code Ann. § 11–46–5(1) (providing that "the immunity of the state and its political subdivisions from claims for money damages arising out of the torts of such governmental entities and the torts of their employees while acting within the course and scope of their employment is hereby waived"); however, § 11–46–5(2) of the MTCA provides that "an employee shall not be considered as acting within the course and scope of his employment and a governmental entity shall not be liable or be considered to have waived immunity for any conduct of its employee if the employee's conduct constituted fraud, malice, libel, slander, *defamation* or any criminal offense other than traffic violations." (Emphasis added). Accordingly, plaintiff's defamation claim does not fall within MTCA's waiver of sovereign immunity and therefore, plaintiffs' defamation claim will be dismissed.

## Conclusion

Based on the foregoing, it is ordered that UMMC's motion for summary judgment is denied as to plaintiffs' claim for retaliation under Title VII, but is granted as to all other claims.

---

**6.** It is certainly arguable that plaintiffs have failed to state a claim for defamation for the reason that they have alleged only that "false statements" were made by UMMC employees during a two-day hearing but do not identify which employees made the allegedly defamatory statements or what those statements were. *See Chalk v. Bertholf,* 980 So.2d 290, 299 (Miss.Ct.App.2007) (holding that "[f]ailure to provide any substance regarding the allegedly slanderous words in the complaint against the appellees was fatal to the appellant's claim"). The court need not dwell on that possibility, however.