# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
May 21, 2013

Lyle W. Cayce
Clerk

No. 12-30290

MARTHA HELEN HAIRE,

Plaintiff - Appellant

v.

BOARD OF SUPERVISORS OF LOUISIANA STATE UNIVERSITY
AGRICULTURAL AND MECHANICAL COLLEGE,

Defendant - Appellee

Appeal from the United States District Court
for the Middle District of Louisiana

Before JOLLY, GARZA, and OWEN, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Plaintiff – Appellant Martha Helen Haire ("Haire") brought this gender discrimination suit against Louisiana State University ("LSU"), alleging the LSU Police Department violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, as well as Louisiana state employment law, LA. REV. STAT. ANN. §§ 23:332(A)(1), 23:967, by failing to promote her to the position of Chief of Police and retaliating against her for filing complaints with the Equal Employment Opportunity Commission ("EEOC") and Louisiana Commission for Human Rights ("LCHR"). The district court granted summary judgment in favor of LSU. Because Haire has established a *prima facie* case of discrimination and

No. 12-30290

there is a genuine disputed issue of fact of whether LSU's alleged non-discriminatory reason for not promoting Haire is pretextual, we hold that summary judgment on the gender discrimination claim was improper. Furthermore, because Haire has shown a conflict in substantial evidence regarding retaliation, we hold summary judgment was also improper on that second claim. We thus REVERSE, VACATE the district court's judgment, and REMAND the case for further proceedings not inconsistent with this opinion.

I.

Haire has been a member of the LSU Police Department ("LSUPD") since 1988. She began as an on-the-beat police officer but was promoted to roles with increased administrative responsibilities, including sergeant, lieutenant, captain, and, finally in 2005, major, a position she still holds. In 2007, Mr. Ricky Adams retired as Chief of Police at LSU, and Haire, believing herself to be a qualified candidate to replace him,[1] decided to apply for the new opening. LSU recruitment policy states that "[i]nternal promotions are strongly encouraged" and that "[e]fforts should be made to identify women and minority candidates for [interim] appointments." Although Haire learned of the Chief opening and applied, she never heard from LSU regarding her application, and Mr. Gary Durham ("Durham"), Public Safety Director of LSU, was soon appointed temporary, "interim" Chief of Police. The position, however, remained open for another two years while LSU's new Chancellor looked for a permanent replacement. While he was interim Chief, Durham performed a variety of actions which, according to Haire, demonstrated his bias against women.[2]

---

[1] The position required that all applicants possess, at minimum, a college degree. Haire has a Bachelor's Degree from the University of Mississippi and a Master's Degree from Faulkner University. Additionally, Ms. Haire completed training at the FBI National Academy.

[2] As the discussion *infra* will show, Durham's alleged actions, while troublesome, are not as crucial to Haire's gender discrimination claim as the comments of another officer,

No. 12-30290

After Durham was appointed and while the search for a permanent replacement continued, Haire allegedly was excluded from decision-making at LSUPD in which her job had previously allowed her to take part. More significantly, Haire claims she began to face hostility from a co-worker, Lawrence Rabalais ("Rabalais"), who was also a LSUPD major and who was competing with Haire for the promotion to Chief of Police. Rabalais allegedly slandered Haire in conjunction with a newspaper article written about Haire's husband,[3] and, of considerable relevance to this case, told a LSUPD co-worker that he wanted to "to get rid of" Haire and *that, if a woman was appointed to the position of Chief, Rabalais would quit.* In this suit, Haire alleges that Rabalais and Durham's alleged misogynism was the reason LSU failed to promote her to the position of Chief. As the impending discussion will show, however, Rabalais's alleged gender bias – rather than Durham's – is more significant in this appeal, because Rabalais was involved in an investigation into Haire's conduct which cost her the promotion, and Rabalais exercised some significant leverage over LSU's decisionmaker.

In May 2009, an incident involving both Haire and Rabalais occurred, which Haire claims provided LSU with a convenient pretext not to promote her.

---

Lawrence Rabalais. Nonetheless, four of Durham's actions, as alleged by Haire, warrant particular mention: (1) One co-worker of Haire's testified that Durham told him in 2009 that he "d[id] not want a woman in th[e] position" of Chief; (2) On an office door, Durham hung a poster, the imagery on which suggested "getting more efficiency out of women employees;" Durham laughed about the poster and showed it to female co-workers; (3) Durham sent "dumb-blonde" jokes to LSUPD employee Sharon Gonzalez; and (4) In 2009, when an article concerning problems the Louisiana Department of Revenue was having was published in the local newspaper, Durham responded by saying, "[T]hat's what happens when you have a bunch of women in charge."

[3] In 2008, shortly after her husband had been arrested for acts irrelevant to this case, Rabalais allegedly notified LSUPD officers of a newspaper article about Haire's husband, laughed openly about the husband's arrest, and instructed that Haire's name be mentioned in conjunction with the story about her husband. Rabalais's alleged intent was to embarrass Haire.

Haire entered information into the police reporting system that made public an arrest of former LSU Dean Carolyn Collins, a high-profile figure on campus. Haire alleges she entered the information after being given a directive from Durham, her superior at the time. Although she believed the request to be somewhat irregular, she believed it to be lawful and carried out the order, resulting in the disclosure of Collins's identity in conjunction with a crime. The incident seems to have developed into an internal scandal because Haire's actions arguably violated police procedure, compromised the integrity of the LSUPD, and embarrassed the University. A series of three disciplinary procedures then followed.

First, the LSUPD held an investigative "244 hearing" to look into the Collins incident. As part of the investigation, Haire was interviewed by Rabalais, her competitor for the position of Chief, who allegedly had said he would quit if a woman were appointed to that role. Second, when the investigation into the Collins incident concluded, Haire received a "Coaching Letter," in which the Chancellor of LSU found Haire's actions "grossly inappropriate" and "most disturbing." The letter acknowledged that Haire had received a directive to enter information into the reporting system from her superior but nonetheless found her acts to be a "violation of proper procedure," which caused the Chancellor to "question [Haire's] trustworthiness" and resulted in her future performance being "closely monitored." Haire disagreed with allegations made in the Coaching Letter and sent a rebuttal to LSU authorities. Third, Rabalais gave Haire the lowest performance evaluation she has received in her twenty-two years with LSUPD, rating her below satisfactory for "job knowledge and technical skills." As a result, Haire allegedly lost her supervisory responsibilities, certain subordinate personnel, her position as commander of Football Gameday Operations, and the ability to earn overtime pay. In her brief,

she contends this "decimating reduction of her duties" essentially stripped her of "her rank, her command, and her job."

Roughly three months after the Collins incident, Michael Martin, LSU's Chancellor, allegedly under the influence of Durham, named Rabalais interim Chief of Police. But Rabalais lacked an undergraduate degree which the position required. This lack of qualification prompted Martin to announce that Rabalais would not assume "full Chief" status until after the completion of his degree requirements, whenever that might occur.[4] Shortly thereafter in September 2009, and in the midst of disciplinary actions described above, Haire filed a Charge of Discrimination with the EEOC and LCHR, alleging illegal discrimination and retaliation. Finally, in January 2010, while Haire's EEOC charge was presumably still pending, Rabalais was appointed permanent Chief of Police. To clarify the specific nature of Haire's claims before the district court, the same that are before us on appeal: she contends her failure to receive the promotion (that was given to Rabalais) was motivated by gender-based discriminatory animus and was retaliation for her EEOC and LCHR complaints.

Haire filed suit against LSUPD, alleging in her amended petition that LSU is liable under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, as well as Louisiana employment law, for gender discrimination, retaliation, and reprisal. LSU filed a motion for summary judgment, arguing that Haire could not show that her gender was a motivating factor in not promoting her to Chief of Police, and that she could not prevail on her retaliation or reprisal claims because there is no causal connection between her protected activity and any adverse employment action. The district court granted summary judgment on behalf of LSU on all claims. Haire timely appealed.

---

[4] Haire alleges that Rabalais "did not even complete the requirements of the online degree himself" and rather asked subordinate employees to do his online coursework in his stead.

No. 12-30290

## II.

We review the district court's grant of summary judgment *de novo*. *Young v. Equifax Credit Information Servs., Inc.*, 294 F.3d 631, 635 (5th Cir. 2002). Summary judgment is proper if, after adequate opportunity for discovery, the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits filed in support of the motion, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). When assessing whether a dispute as to any material fact exists, we consider all the evidence in the record but refrain from making credibility determinations or weighing the evidence; instead, we draw all reasonable inferences in favor of the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

In employment discrimination cases, if the plaintiff establishes a *prima facie* case of discrimination, the burden of production shifts to the employer to provide a legitimate, non-discriminatory reason for the action. *Manning v. Chevron Chem. Co., LLC*, 332 F.3d 874, 881 (5th Cir. 2003). This approach is referred to by courts as the *McDonnell Douglas* analysis or framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). If the defendant offers such a justification, the burden shifts back to the plaintiff, who can attempt to show that the defendant's proffered reason is simply a pretext for discrimination. *Manning*, 332 F.3d at 881. To carry this burden in a discrimination case, the plaintiff must put forward evidence rebutting each of the nondiscriminatory reasons the employer articulates. *Wallace v. Methodist Hosp. System*, 271 F.2d 212, 220 (5th Cir. 2001). A plaintiff may establish pretext by showing that a discriminatory motive more likely motivated her employer's decision, such as through evidence of disparate treatment, or that her employer's explanation is unworthy of credence. *Id*. (inset quotations omitted).

No. 12-30290

## III.

We begin by addressing Haire's first claim: that LSU violated Title VII by discriminating against her on the basis of her gender when it failed to promote her to the position of Chief of Police.[5] For the purposes of reviewing this summary judgment motion, we will assume *arguendo* that the comments by Durham and Rabalais do not constitute direct evidence of discrimination and, consequently, that the usual *McDonnell Douglas* framework applies.[6] *See McDonnell Douglas*, 411 U.S. at 802-05.

Under the *McDonnell Douglas* test, a Title VII plaintiff alleging gender discrimination must show (1) that she is a member of a protected class; (2) that she was qualified for the position sought; (3) she was subject to an adverse employment action; and (4) she was replaced by someone outside her protected class or was treated less favorably than other similarly situated employees outside her class. *Fahim v. Marriott Hotel Servs.*, 551 F.3d 344, 350 (5th Cir. 2008) (citations omitted). Haire has made a *prima facie* case: she is (1) a female, who (2) was – based on her college degree and relevant years of experience on

---

[5] This claim is not time-barred. Under Title VII, a plaintiff alleging gender discrimination must file a complaint with the EEOC within 180 days of the alleged discriminatory act or within 300 days if the plaintiff has initially instituted proceedings with a state or local agency with authority to grant relief. 42 U.S.C. § 2000e-5(e)(1). Discrimination claims brought under Louisiana law are subject to a one-year prescriptive period. LA. REV. STAT. ANN. § 23:303(D). Citing these provisions and considering the relevant dates in Haire's suit, the district court held that any alleged discrimination claims based on LSU's acts prior to December 3, 2008 are time-barred and any claims arising under Louisiana law based on LSU's acts prior to March 25, 2009 have prescribed. Thus, to the extent that Haire argues that Durham's promotion amounted to gender discrimination, that claim is time-barred because Durham's appointment happened in 2007. The rest of her claims, however, are not time-barred. The alleged statements that Rabalais did not want a woman in the position of Chief, for example, began in 2007 and continued into 2008 and 2009, and, furthermore, the Collins incident happened in 2009.

[6] Although Haire argues that she has offered direct evidence and that *McDonnell Douglas*, therefore, does not apply, our discussion *infra* herein will indicate that we need not decide that question because, even under the indirect, circumstantial evidence analysis employed by the district court, summary judgment was premature.

No. 12-30290

LSUPD – qualified for the position of Chief.  On two separate occasions, when Rabalais was named interim Chief and again when he was named permanent Chief, she was (3) passed over for a promotion.  Failure to promote is clearly an adverse employment action.  *Breaux v. City of Garland*, 205 F.3d 150, 157 (5th Cir. 2000) ("Adverse employment actions are discharges, demotions, refusals to hire, *refusals to promote*, and reprimands.") (internal quotation marks omitted) (emphasis added).  Finally, (4) a similarly situated male employee, Rabalais (who began work for the LSUPD at roughly the same time as Haire and, at the relevant time, had the same rank as Major), was treated differently.  Rabalais was hired instead of Haire, even though he lacked a college degree.  Thus, Haire has set forth a *prima facie* case of gender-based discrimination under Title VII.[7]

The next step, therefore, is to assess whether LSU has provided a legitimate non-discriminatory justification for issuing the Coaching Letter and not promoting Haire.  *See Manning*, 332 F.3d at 881.  LSU has done so.  It produced testimony that Haire was passed over for the promotion because Chancellor Martin decided she had violated police procedure during the Collins incident and thus could not be trusted with a significant increase in responsibility.  Chancellor Martin, for example, testified that, in the context of reviewing some 1,500 police reports, he saw no report of a LSUPD official

---

[7] In addition to her federal discrimination claim under Title VII, Haire brings a state law claim under LA. REV. STAT. ANN. § 23:332(A)(1), which states that it is "an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual, with respect to [her] compensation, or [her] terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  Louisiana courts have looked to federal anti-discrimination jurisprudence in interpreting Louisiana's anti-discrimination statutes, s*ee, e.g., Plummer v. Marriott Corp.*, 654 So. 2d 843, 848 (La. App. 4 Cir. 1995), and we have held that the appropriate framework for analyzing a retaliation claim under the Louisiana Whistleblower Statute is the same as that applied in Title VII retaliation cases, *see Smith v. A&T Solutions, Inc.*, 90 F. App'x. 718, 723 (5th Cir. 2004); *cf. Smith v. Amedisys, Inc.*, 298 F.3d 434, 448 (5th Cir. 2002). Thus, when we evaluate the Title VII discrimination claim *infra* herein, we dispose of the state law claims as well.

performing the same actions that got Haire in trouble, that is, entering the same information into the "police report posting" system twice.[8] He further testified that, in the wake of the Collins incident, he wanted Haire terminated because "if Major Haire knew how [the police report posting system] worked, and Major Haire knew what the policy was, that it struck [him] that Major Haire ought not to have two file numbers posted on that website". Another employee, Marian Callier, also testified that Haire's actions were "not proper procedure" and that, in her opinion, Haire should have been terminated for her actions in connection with the Collins incident. Taken together, these statements satisfy the employer's burden: according to LSU, it did not promote Haire because of her misconduct during the Collins incident.

Because LSU has offered a legitimate non-discriminatory reason for its decision, the third step in the *McDonnell Douglas* analysis is for Haire to show, by rebutting the nondiscriminatory reason articulated by the employer, that LSU's stated reason for the failure to promote was a pretext for gender discrimination. *See Laxton v. Gap, Inc.*, 333 F.3d 572, 578 (5th Cir. 2003). Pretext is the crux of Haire's case; she provides evidence that she was following a lawful order from her supervisor and LSUPD had no formal written procedure that clearly prohibited her from obeying her supervisor's command to file a second report.[9] For her, what followed from the Collins incident was all a

---

[8] Although neither party is very clear about this reporting system, it appears to work as follows: when a police report is first written, it is immediately posted on LSUPD's "blotter" and website. In this case, after the initial police report involving former LSU Dean Carolyn Collins was posted, the report did not include any information of Collins's actual arrest because, at the time, the arrest had not yet been made. When, however, Durham instructed Haire to enter the information regarding Collins into the system a second time, with a new file number, Haire included information of Collins's arrest (which, by that later point, had occurred). When this information went public, an on-campus scandal involving Collins, a high-profile figure, resulted.

[9] LSU has not introduced any evidence suggesting the existence of such a formalized procedure.

charade that LSU undertook to cover its tracks in the sex discrimination suit it anticipated. By papering Haire's files with disciplinary write-ups, it could protect itself with a sham justification for not promoting a female applicant who was more qualified. Haire's theory, then, is that she was punished, based on wholly arbitrary and subjective criteria; for an act she had an obligation to perform; and the subsequent formal reprimand cost her the promotion. Haire points to the close timing between the selection of Rabalais as interim Chief and the issuance of the Coaching Letter, and argues the items of circumstantial evidence create genuine issues of material fact on the legitimacy and truth of LSU's proffered justification for failing to select Haire for the promotion. We agree that Haire has produced evidence sufficient for a jury to rule in her favor on these underlying predicate points.

Regarding the Collins incident, for instance, the record shows that Durham, Haire's supervisor at the time, gave her a command with which she was bound to comply. In his deposition, Durham testified that he gave Haire a lawful order. He acknowledged that, if she had not obeyed it, she could have been disciplined by the department. Rabalais, in his deposition, added that, assuming Haire had obeyed a lawful order from Durham, she would not have done anything wrong. And Marian Callier, finally, stated that Haire initially questioned Durham's order as improper procedure but that he instructed her to enter the information into the police blotter anyway. This evidence is sufficient to raise a genuine issue of material fact. There is a bona fide question whether LSU's purported justification for not promoting Haire, whose credentials were superior to those of Rabalais, was pretextual; and there is the further question whether Haire could have committed any official wrongdoing when she complied with her superior's directives.[10]

_____

[10] Haire need not introduce further evidence that the disciplinary measures that followed from the Collins incident were motivated by gender bias. Evidence demonstrating

No. 12-30290

IV.

However, this determination does not end the inquiry into LSU's motive for not promoting Haire. As the district court and LSU point out, the ultimate decision to hire someone other than Haire was made by Chancellor Martin, not Rabalais, and the record does not indicate that Martin directly engaged in any discrimination or made any remarks regarding Haire's gender. Under the "cat's paw" theory of liability,[11] however, it is possible that Rabalais's remarks that he wanted "to get rid of" Haire and that he would resign if a female were appointed Chief may be imputed to Martin, the formal decisionmaker, if Rabalais played a role in the ultimate selection.

Under the four-factor test set forth in *Brown v. CSC Logic, Inc.*, 82 F.3d 651 (5th Cir. 1996), a workplace remark constitutes sufficient evidence of discrimination if it is (a) related to the protected class of persons of which the plaintiff is a member, (b) proximate in time to the employment decision at issue, (c) *made by an individual with authority over the employment decision at issue*, and (d) related to the employment decision at issue. *Auguster v. Vermillion Parish Sch. Bd.*, 249 F.3d 400, 405 (5th Cir. 2011) (internal quotation marks omitted) (emphasis added). The district court held that Haire failed to satisfy

---

that the employer's explanation is false or unworthy of credence, taken together with the plaintiff's *prima facie* case, is likely to support an inference of discrimination *even without further evidence of defendant's true motive. Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002). No further evidence of discriminatory animus is required because "once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation . . . ." *Reeves*, 530 U.S. at 147.

[11] Under the cat's paw theory, a subordinate employee's discriminatory remarks regarding a co-worker can be attributed to the workplace superior, ultimately the one in charge of making employment decisions, when it is shown that the subordinate influenced the superior's decision or thought process. *See, e.g., Staub v. Proctor Hospital*, 131 S. Ct. 1186, 1193 (2011) (stating that an "employer is at fault [when] one of its agents committed an action based on discriminatory animus that was intended to cause, and did in fact cause, an adverse employment action."); *see also Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 653 (5th Cir. 2004); *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990).

the *Brown* test because, under the third element, "neither Durham nor Rabalais had authority over the decision on the hiring of the Chief of Police." The record, however, indicates Rabalais played a role in the investigation of Haire, was responsible for parts of the Coaching Letter, and reported to the formal decisionmaker, Chancellor Martin, about the "normal procedure" within the LSUPD with respect to entering information into the police report posting system. For example, in Martin's deposition, the following exchange occurred:

> Q: Did you[, Chancellor Martin] ever have any conversations with Rabalais about what happened in the Collins' situation?
>
> A: I asked – I asked Rabalais . . . about normal procedure within the Department.
>
> Q: And what did he say?
>
> A: He explained to me [that double numbering] . . . was not the way you do business.

Consequently, Chancellor Martin's understanding was that:

> A: . . . [I]f Major Haire knew how it worked, and Major Haire *knew what the policy was*, that it struck me that Major Haire ought not to have two file numbers posted on that website.

(Emphasis added.) Thus, the Chancellor, who was new to LSU at the time[12] and unfamiliar with LSUPD policy, obtained from Rabalais what the "normal procedure" was and then attributed wrongdoing to Haire for violating what he understood, from Rabalais's description, that procedure to be. This evidence sufficiently establishes, for the purposes of avoiding summary judgment, that Rabalais, a party demonstrating discriminatory animus, "*had influence . . .* over the official decisionmaker . . . ." *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 226 (5th Cir. 2000) (emphasis added). In such a situation, our

---

[12] Martin began his position as Chancellor roughly eight months prior to the Collins incident.

No. 12-30290

jurisprudence holds that "it is proper to impute [the] discriminatory attitude[] to [that] formal decisionmaker." *Id.* Consequently, the district court erred by holding that Rabalais's discriminatory animus cannot be imputed to Martin for the purpose of creating an issue of disputed fact.

## V.

Haire also brings a retaliation claim under Title VII and a reprisal claim under the Louisiana Whistleblower Statute, LA. REV. STAT. ANN. § 23:967(A),[13] alleging that LSU retaliated against her by issuing the Coaching Letter and low performance evaluation, not promoting her, and changing her job duties. When we evaluate the Title VII retaliation claim *infra* herein, we dispose of the state law retaliation claim as well.[14]

In order to establish a *prima facie* case of retaliation under Title VII, a plaintiff must show that (1) she engaged in activity protected by the statute, (2) an adverse employment action occurred, and (3) a causal link exists between the protected activity and the adverse employment action. *Evans v. City of Houston*, 246 F.3d 344, 352 (5th Cir. 2001). If a plaintiff succeeds in establishing a *prima facie* case, the *McDonnell Douglas* burden shifting framework then applies. *Id.* at 354. Here, Haire's protected activity consists of filing discrimination complaints with the EEOC and LCHR and sending a rebuttal letter to

---

[13] That statute states, in relevant part, "An employer shall not take reprisal against an employee who in good faith, and after advising the employer of the violation of the law: (1) Discloses or threatens to disclose a workplace act or practice that is in violation of the law . . . ." LA. REV. STAT. ANN.§ 23:967(A).

[14] *See supra* n.7.

No. 12-30290

Chancellor Martin, so she has clearly met the first prong of the test.[15]  *See* 42 U.S.C. § 2000e-3(a).

Viewing the evidence in the light most favorable to Haire, we hold that the second prong also has been satisfied.  Ever since a male officer, Bart Thompson, was hired by LSUPD, Rabalais admits that he has ceased referring officers to Major Haire and now instead refers them to Major Thompson when they have questions regarding their duties.  Sharon Gonzalez, who worked in LSU Risk Management alongside Haire and Durham, testified that Haire is "alienated from administration at the police department," that "Rabalais doesn't talk to her," and that the situation has "gotten worse since this lawsuit."  Gonzales further said that Rabalais "demeans" Haire and "keeps her out of meetings."  In sum, Gonzalez felt that LSU is "taking things away from [Haire]."  Haire has also become ineligible for overtime pay,[16] which has an effect on her income.  Thus, although it is probably hyperbole to say as Haire does in her brief, that "virtually all of her job duties have been removed," it is nonetheless true that Haire has put forth modest evidence that her job has changed, that she has been excluded from meetings, and that her pay may have been affected.  Collectively, these occurrences rise to the level of a Title VII "adverse employment action."  *See McCoy v. City of Shreveport*, 492 F.3d 551, 559-60 (5th Cir. 2007) (stating

---

[15] However, Haire's allegation that the *Coaching Letter* constitutes retaliation or reprisal fails, since she did not engage in any protected activity *prior* to receiving the letter. The letter was issued on August 26, 2009, the EEOC and LCHR complaints were filed on September 29, 2009, and her rebuttal was sent on October 21, 2009.  The letter, thus, could not be "retaliation" for an EEOC charge that had yet to be filed.

[16] The record contains some evidence substantiating this allegation: Haire produced an email in which Rabalais issued a directive to Haire stating "I do not want  . . . you working event overtime."  As this decision may have affected Haire's income, it arguably constitutes an adverse employment action.  *See Gomez v. Orleans Parish Sch. Bd.*, 2005 U.S. Dist. LEXIS 17810, at 41  ("[P]laintiff's claims of Title VII retaliation based on her . . . having been denied the opportunity to perform overtime work . . . might conceivably be classified as [an] adverse employment action[].")

14

that "The anti-retaliation provision [of Title VII], *unlike the substantive* [discrimination] *provision* is not limited to discriminatory actions that affect the terms and conditions of employment . . . Even though our precedent recognizing only 'ultimate employment decisions' as actionable adverse employment actions remains controlling for Title VII *discrimination* claims . . . retaliation claims require[] a closer look . . .").[17]   Drawing all inferences in favor of Haire, the occurrences are more than "petty slights, minor annoyances, and simple lack of good manners" that employees regularly encounter in the workplace, and which the Supreme Court has recognized are not actionable retaliatory conduct.  *See Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 485 (5th Cir. 2008) (internal quotation marks omitted).

The third prong of the Title VII *prima facie* retaliation case is the "causal connection" between the protected activity, in this case the filing of the EEOC charge, and the adverse employment action.  As proof that she has satisfied this prong, Haire points to circumstantial evidence – the close timing (roughly three months) between the EEOC charge and the naming of Rabalais as permanent Chief.  *See Clark County School Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (noting that "very close" temporal proximity between the protected activity and retaliatory conduct is enough to make a *prima facie* showing of causation but holding that a twenty-month period was not close enough).  Here, Rabalais was named interim Chief in August 2009, Haire filed her EEOC charge on September 29, 2009, and Rabalais was named permanent Chief in January

---

[17] The district court brushed by the adverse employment action prong of the retaliation analysis, focusing only on the performance evaluation Haire received and ultimately concluding that the evaluation did not satisfy the prong because it "did not result in demotion, decrease in pay, decrease in benefits, termination, nor has LSU relied on the evaluation."  But, as outlined above, the performance evaluation is not the only action at issue in the retaliation analysis.  Also at issue are the alleged changes in Haire's job duties and income that followed from the Collins incident but which were not directly tied to the performance evaluation.

No. 12-30290

2010.[18] This timing, coupled with the gradual changes in Haire's duties noted by Sharon Gonzalez, is enough to satisfy the third prong. *See O'Neal v. Ferguson Const. Co.,* 237 F.3d 1248, 1253 (10th Cir. 2001) (stating "[A] jury could have inferred . . . that the reallocation of [an employee's] responsibilities soon after the filing of the EEOC claim . . . provid[ed] the causal connection between the EEOC filing and the adverse employment action.").

Even if Haire established a *prima facie* case of retaliation under Title VII, she must respond to LSU's alleged non-retaliatory reason for her failure to receive a promotion and show that the retaliation was a "but for" cause of the adverse employment decision. *Long v. Eastfield Coll.*, 88 F.3d 300, 305 n.4 (5th Cir. 1996) (internal quotation marks omitted). To defeat a motion for summary judgment, a Title VII plaintiff, like Haire, must show there is a conflict in substantial evidence on this ultimate issue. *Long*, 88 F.3d at 308 (inset quotation marks omitted). "Evidence is substantial if it is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Id.* (inset quotation marks omitted). For the same reasons outlined *supra* herein with regard to discrimination, we hold that Haire has met her burden of showing a conflict in substantial and relevant evidence, as LSU and Haire make competing allegations, and credibility determinations are best left for trial. Thus, the district court erred in granting LSU summary judgment on the retaliation claims.

## VI.

We conclude that the district court erred in granting summary judgment to LSU because Haire has produced evidence sufficient to raise a genuine issue

---

[18] Having found the second prong not to be satisfied, the district court did not reach the third, "causal link" prong.

No. 12-30290

of material fact of whether LSUPD's gender discrimination motivated the University's decision to promote Rabalais instead of Haire. We further conclude there exists a genuine issue of material fact of whether the University retaliated against Haire for sending a rebuttal letter to the Chancellor and filing EEOC and LCHR complaints. The judgment of the district court dismissing Haire's complaint is therefore REVERSED and VACATED, and the case is REMANDED for proceedings not inconsistent with this opinion.

REVERSED, VACATED
and REMANDED.