# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-11225

United States Court of Appeals
Fifth Circuit

**FILED**

November 10, 2014

Lyle W. Cayce
Clerk

SATOMI NIWAYAMA,

Plaintiff - Appellant

v.

TEXAS TECH UNIVERSITY,

Defendant - Appellee

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 5:12-CV-00090

Before  DAVIS, DENNIS, and COSTA, Circuit Judges.

PER CURIAM:*

Plaintiff-Appellant, Satomi Niwayama ("Niwayama"), a Japanese woman, appeals the district court's summary judgment in favor of Defendant-Appellee, Texas Tech University ("TTU"), dismissing Niwayama's tenure denial claim under Title VII and pay disparity claims under Title VII and the Equal Pay Act ("EPA").  We AFFIRM in part, VACATE in part, and REMAND.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 13-11225

I.

Niwayama was hired by TTU in 2004 as an associate professor of chemistry. She applied for tenure in 2004, 2005, 2008, and 2009. Her application was denied each time by the Provost. Niwayama was notified of the Provost's fourth and final decision to deny tenure in May 2010.

Although the decision to reject Niwayama's application for tenure was ultimately the Provost's, this decision was based on a multi-step process involving input from the department chairperson, a department committee, the dean of the college, and a college committee. When the Provost was deciding on Niwayama's fourth and final application for tenure, he had recommendations in favor of tenure from the head of the college Dean Schovanec, the college committee, and the department committee. The only recommendation against tenure was submitted by Dominick Casadonte, the chair of the department.

When the Provost denied Niwayama's fourth and final application for tenure in the 2009-2010 academic year, this was the last year of Niwayama's probationary period as an associate professor. Once tenure was denied at the conclusion of this probationary period, it was expected that Niwayama's position with the university would be terminated. However, unlike on the three previous tenure denials, Niwayama decided to appeal the Provost's May 2010 decision to a tenure hearing panel. In November 2010, the five member panel issued the following findings regarding the Provost's decision:

> 1. Dr. Niwayama was apparently held to a different standard than other faculty members tenured at the time of her tenure application in regard to grants. She and another faculty member brought grants to the University when they were hired, yet the other faculty member's grant was considered adequate whereas Dr. Niwayama's was not. . . . [N]either individual's grant was truly written and received while a faculty member at TTU.

2

No. 13-11225

> However, the other faculty member was favorably evaluated for tenure largely based upon this grant. Further, the grant funds expended by Dr. Niwayama at TTU exceeded those of a third faculty member who was also granted tenure at TTU.
>
> 2. Dr. Niwayama was apparently held to a different standard than other faculty members tenured at the time of her tenure application in regard to teaching evaluations. Her teaching evaluations were comparable to other applicants. Other candidates received early tenure with lower student evaluation scores than Dr. Niwayama's. These included a faculty member who was tenured in 2007 with overall averages of 3.65 and 3.55, and another whose scores were 2.6, 2.95 a year before his tenure. Dr. Niwayama's scores were 3.94, 3.96, while the faculty member who started the same year she did and received tenure scored 3.95, 3.86. Further, this faculty member was allowed one semester with no teaching responsibilities, whereas Dr. Niwayama carried an additional teaching load.
>
> Based on our findings, we do not believe that the faculty member was fairly evaluated based on consistent application of the established standards for tenure . . . .

As Niwayama explains and as TTU does not contest, the faculty member mentioned in the passage, whose previous research funding was credited toward his tenure application was Joachim Weber. TTU also concedes that Niwayama "had slightly higher teaching evaluations than Weber," suggesting that Weber may have been one of the faculty members referenced in paragraph two of the Tenure Hearing Panel's findings quoted above. It is also uncontested that, although Weber and Niwayama were hired during the same year and for

3

No. 13-11225

the same compensation, Weber received increasingly higher compensation than Niwayama during each successive year of their employment.[1]

In spite of the Tenure Hearing Panel's findings, however, the University President rejected Niwayama's appeal of the Provost's decision in March 2011. Niwayama then filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") in October 2011. On May 14, 2012, Niwayama filed suit in state court against TTU alleging discriminatory treatment based on her gender and national origin in violation of Title VII, 42 U.S.C. § 2000e, and the Equal Pay Act, 29 U.S.C. § 206(d) ("EPA").[2] The alleged discriminatory treatment included TTU's failure to (1) grant Niwayama's tenure as a university professor and (2) pay Niwayama as much as her male colleagues and non-Japanese female colleague for similar work.

TTU filed a motion for summary judgment, which the district court granted. According to the district court, Niwayama's claims based on tenure denial were untimely. The district court also concluded that Niwayama's claims for pay disparity failed based on a lack of summary judgment evidence regarding pretext (under Title VII) and regarding TTU's use of a gender-

---

[1] Below are Niwayama's and Weber's salaries from the start of their employment at TTU until Niwayama was placed on termination track:

| Year | Niwayama | Weber |
| --- | --- | --- |
| 2004-2005 | $55,000.00 | $55,000.00 |
| 2005-2006 | $56,100.00 | $56,650.00 |
| 2006-2007 | $57,180.00 | $57,741.00 |
| 2007-2008 | $58,872.00 | $59,599.00 |
| 2008-2009 | $59,982.00 | $60,982.00 |
| 2009-2010 | $61,781.46 | $65,811.20 |

This chart was submitted by TTU and adopted by the district court in its opinion.

[2] Niwayama also brought claims under Chapter 21 of the Texas Labor Code. The district court granted summary judgment as to these claims based on untimeliness, which Niwayama has not challenged in the present appeal.

4

No. 13-11225

neutral merit system (under the EPA).  This appeal followed.

## II.

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  At this stage of litigation, the court must view the evidence in the light most favorable to the non-movant and may not make credibility determinations.[3]

## III.

Niwayama argues that the district court erred in granting summary judgment for the following reasons: (1) the Lilly Ledbetter Fair Pay Act of 2009[4] (the "Ledbetter Act" or the "Act") extends the limitation period of Niwayama's Title VII tenure denial claim; (2) Niwayama provided sufficient evidence to create a genuine issue of fact regarding pretext in the Title VII pay disparity claim based on gender and national origin discrimination; and (3) TTU failed to prove that its "merit" based system of pay actually explains the pay differences.

### A. Title VII Tenure Denial Claim

Generally, a Title VII claim is timely under 42 U.S.C. § 2000e-5(e)(1) if it is filed within either 180 days or 300 days[5] of the alleged discriminatory act. As the Supreme Court explained in *Delaware State College v. Ricks*, this time period is deemed to have commenced "at the time the tenure decision was made

---

[3] *Tiblier v. Dlabal*, 743 F.3d 1004, 1007 (5th Cir. 2014).

[4] 42 U.S.C. § 2000(e)-5(e)(3)(A).

[5] *See Haire v. Bd. of Supervisors of La. State Univ.*, 719 F.3d 356, 363 n.5 (5th Cir. 2013) ("Under Title VII, a plaintiff alleging gender discrimination must file a complaint with the EEOC within 180 days of the alleged discriminatory act or within 300 days if the plaintiff has initially instituted proceedings with a state or local agency with authority to grant relief.").

No. 13-11225

and communicated" to the aggrieved employee.[6]

Accordingly, the date on which this limitation period began to run was May 2010, when the Provost informed Niwayama of the decision to deny her application for tenure.  Although the President of the University did not finally reject Niwayama's appeal and confirm the Provost's decision until March 2011, the law is clear that the limitation period is not tolled or affected in any way by "the pendency of . . . university grievance procedures," which a plaintiff voluntarily chose to pursue but legally "need not have pursued" prior to commencing a Title VII lawsuit.[7]  As the district court concluded, the tenure denial claim expired under 42 U.S.C. § 2000e-5(e)(1) in October 2011, and Niwayama filed her lawsuit in May 2012.

Niwayama argues, however, that the limitation analysis is altered by the Ledbetter Act.  The Act provides that "an unlawful employment practice occurs . . . when a discriminatory compensation decision or other practice is adopted . . . including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other practice."  In Niwayama's view, because the Provost's decision to deny her tenure had consequences for her compensation, the Provost's decision constituted a "discriminatory compensation decision" under the Ledbetter Act.  Accordingly, Niwayama argues, a new Title VII claim for denial of tenure accrued each time she received a paycheck that was affected "in whole or in part" by the Provost's allegedly discriminatory decision.  As authority, Niwayama cites only to *Gentry v. Jackson State University*, 610 F. Supp. 2d 564, 567 (S.D. Miss. 2009). Niwayama acknowledges, however, that this district court's decision stands for "a minority view."

---

[6] 449 U.S. 250, 258 (1980).

[7] *See Holmes v. Texas A&M Univ.*, 145 F.3d 681, 685 (5th Cir. 1998).

No. 13-11225

Indeed, Niwayama's argument is contrary to the overwhelming weight of authority on this issue. Specifically, the Tenth Circuit explained that under the Ledbetter Act "hiring, firing, promotion, demotion, and transfer decisions, though often touching on pay, should and do accrue as soon as they are announced."[8] Similarly, the District of Columbia Circuit held that the Ledbetter Act's use of "the phrase 'discrimination in compensation' means paying different wages or providing different benefits to similarly situated employees, not promoting one employee but not another to a more remunerative position."[9] The Third Circuit also rejected an argument similar to Niwayama's because a more "expansive interpretation of 'other practice' . . . would potentially sweep all employment decisions under the 'other practice' rubric" set forth in the Ledbetter Act.[10] Finally, this Court in an unpublished opinion held that the Ledbetter Act does not apply to "discrete acts" by employers such as "termination, failure to promote, denial of transfer, and refusal to hire."[11]

Based on these authorities, therefore, the district court was correct to conclude that the limitation period under 42 U.S.C. § 2000e-5(e)(1) had run on May 14, 2012 when Niwayama filed her suit. Accordingly, the district court correctly dismissed Niwayama's tenure denial claim under Title VII.

*B. Title VII Pay Disparity Claim*

In contrast to the Title VII tenure denial claim, the pay disparity claim falls under the Ledbetter Act and therefore is not time barred. The Ledbetter

---

[8] *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 630-31 (10th Cir. 2012) (citation and internal quotation marks omitted).

[9] *Schuler v. PricewaterhouseCoopers, L.L.P.*, 595 F.3d 370, 374 (D.C. Cir. 2010).

[10] *Noel v. The Boeing Co.*, 622 F.3d 266, 275 (3d Cir. 2010).

[11] *Tillman v. S. Wood Preserving of Hattiesburg, Inc.*, 377 F. App'x 346, 349-50 & n.2 (5th Cir. 2010).

Act explicitly excepts pay disparity claims from the *Ricks* analysis and makes each paycheck at an allegedly discriminatory rate a separate, discrete act of discrimination, effectively resetting the statute of limitations for filing an EEOC charge.[12]  Furthermore, the Act allows a plaintiff to recover "back pay for up to two years preceding the filing of the charge," provided that the "unlawful employment practices" that occurred during the filing period are "similar or related to unlawful employment practices with regard to discrimination in compensation that occurred outside the time for filing a charge."[13]

Niwayama filed a charge of discrimination with the EEOC on October 24, 2011.  Therefore, under the Ledbetter Act, Niwayama can obtain relief for discriminatory pay disparity from October 24, 2009 (two years prior to the filing of her EEOC charge).  It is unclear from the record what time period Niwayama alleges discriminatory pay under Title VII;[14] however, at most, she can obtain relief beginning in October 2009.

As to the substance of this claim, Title VII prohibits discrimination on the basis of "race, color, religion, sex, or national origin."[15]  The Title VII inquiry is whether the defendant intentionally discriminated against the plaintiff based on her gender or national origin.[16]  An intentional discrimination claim can be established by either direct or circumstantial

---

[12] *Groesch v. City of Springfield, Ill.*, 635 F.3d 1020, 1024 (7th Cir. 2011).

[13] 42 U.S.C. § 2000(e)-5(e)(3)(A). TTU does not contest the application of the Ledbetter Act to Niwayama's federal pay disparity claims.

[14] Niwayama's district court complaint and summary judgment evidence fails to identify the exact dates she alleges she was subjected to discriminatory pay in violation of Title VII. Niwayama does allege discriminatory pay practices going back to 2004.

[15] 42 U.S.C. § 2000(e)-2(a)(1).

[16] *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 651 (5th Cir. 2004).

evidence.[17]  When analyzing a discrimination claim based on circumstantial evidence, we apply the *McDonnell Douglas* burden-shifting framework.[18] Under *McDonnell Douglas*, the plaintiff must demonstrate that she (1) is a member of a protected class; (2) was qualified for the position she sought or held; (3) suffered an adverse employment action; and (4) was treated less favorably than another similarly situated employee outside the protected group.[19]  If the plaintiff succeeds in establishing her prima facie case, the burden shifts to the defendant to identify a non-discriminatory justification for the adverse employment action.[20]  If the employer does articulate a valid justification, the burden then shifts back to the plaintiff to demonstrate a fact issue as to whether the employer's proffered reason is pretextual.[21]

Niwayama alleges that she was discriminated against because of her national origin and gender.  More specifically, Niwayama claims that she was not paid the same salary as male and non-Japanese counterparts in the chemistry department.  Only the issue of pretext is disputed – whether Niwayama has produced sufficient evidence to show that the reason TTU gave her for her pay inequality was pretextual.  She argues that the summary judgment evidence was sufficient to carry her burden by showing that she was treated less favorably than another similarly situated employee.  We are satisfied that Niwayama has produced enough evidence to create a genuine issue of material fact on this element. Joachim Weber, a male assistant professor at TTU hired at the same time as Niwayama in the same department,

---

[17] *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 992 (5th Cir. 2005).

[18] *Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 259 & n.11 (5th Cir. 2009).

[19] *Haire,* 719 F.3d at 363.

[20] *Black v. Pan Am. Labs., L.L.C.*, 646 F.3d 254, 259 (5th Cir. 2011).

[21] *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 345 (5th Cir. 2007).

received a higher annual salary during the years they taught at TTU. According to the summary judgment evidence, this inequality occurred despite Weber's lower teaching evaluations and similar history of obtaining grants.

This conclusion is supported by other evidence in the summary judgment record and tends to support Niwayama's claim of pretext rather than TTU's argument that the pay differential was based on a neutral formula. It is true that Casadonte, the department chair, stated that the pay disparity affecting Niwayama resulted from the application of a neutral formula based on objective measurements of Niwayama's research funding and teaching evaluations. But neither Casadonte nor any other university official was willing to provide with any precision how the salary is computed. Perhaps more importantly, the Tenure Hearing Panel disagreed with Casadonte's reasoning and determined that Niwayama was held to a heightened standard in the areas considered, such as funding and teaching evaluations. Because the same department administrator (Casadonte) considered the same factors (funding and teaching evaluations) both in issuing the single recommendation to deny tenure and in applying the payment "formula," we find a reasonable jury could make the inference that the payment formula (like the tenure criteria) was applied selectively and inconsistently.[22]

We are persuaded that the hearing panel's conclusion that TTU was applying a selective, inconsistent standard to Niwayama in comparison to other similarly situated colleagues regarding tenure supports the argument that some disparity was being applied to her regarding pay.[23]

---

[22] We have suggested in several of our decisions, such as *E.E.O.C. v. Louisiana Office of Community Services*, 47 F.3d 1438, 1444-46 (5th Cir. 1995), that an inference of pretext may be drawn based on evidence showing that an employer's relevant rules and standards "were not consistently applied."

[23] TTU has placed considerable emphasis on Louisa Hope-Weeks, a female professor who was paid more than most men in the department. But, even if Hope-Weeks was not

No. 13-11225

We conclude that Niwayama's Title VII discriminatory pay claim is limited to the period of October 2009 (two years prior to filing her EEOC complaint) until May 2010 when Niwayama was placed on termination track for pay purposes. TTU has established a policy of denying pay increases while the employee was on this status.

## C. Equal Pay Act Claim

Similar to Niwayama's pay disparity claim under Title VII, her claim under the EPA also survives summary judgment. Under the EPA, as codified at 29 U.S.C. § 206(d):

> "No [covered] employer . . . shall discriminate . . . between employees on the basis of sex by paying wages to employees . . . at a rate less than the rate at which he pays wages to employees of the opposite sex . . . except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex . . . ."

The EPA's burden-shifting framework is similar but not identical to that applied under Title VII. "'Once a plaintiff has made her prima facie case by showing that an employer compensates employees differently for equal work, the burden shifts to the defendant to' show by a preponderance of the evidence that the differential in pay was made pursuant to one of the four enumerated exceptions."[24]

While the analysis under the EPA is theoretically different than the analysis under Title VII, for purposes of this appeal the same facts create a genuine dispute. Because TTU did not produce the "complicated formula" that

---

subjected to discrimination, it does not mean that Niwayama failed to show a genuine factual issue in her Title VII claim. *See Walther v. Lone Star Gas Co.*, 952 F.2d 119, 123 (5th Cir. 1992).

[24] *King v. Univ. Healthcare Sys., L.C.*, 645 F.3d 713, 723 (5th Cir. 2011) (quoting *Siler–Khodr v. Univ. of Tex. Health Sci. Ctr. San Antonio*, 261 F.3d 542, 546 (5th Cir. 2001)).

No. 13-11225

it relies upon in determining merit raises and the Tenure Hearing Panel concluded that factors in the formula were being selectively applied, we are persuaded that Niwayama has produced sufficient evidence to create a genuine issue of material fact.

IV.

Because Niwayama's Title VII tenure denial claim was not brought timely, we AFFIRM the district court's summary judgment in favor of TTU on that claim. We also conclude, however, that Niwayama produced sufficient evidence to raise a genuine dispute as to material facts regarding her pay disparity claims under Title VII and the EPA. We therefore VACATE the district court's order dismissing the Title VII and EPA pay disparity claims and REMAND this case to the district court for further proceedings consistent with this opinion.